UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Teresa A. Valerio,

                    Petitioner,                    08-CV-4253 (CPS)

    - against -
                                                   MEMORANDUM OPINION
Commissioner of Social Security,                   AND ORDER

                    Respondent.

-----------------------------------------X

SIFTON, Senior Judge.

        Teresa A. Valerio ("plaintiff") commenced this action

against Michael J. Astrue, the Commissioner of Social Security

("defendant" or "Commissioner") on October 10, 2008, seeking

review of defendant's decision denying her application for Social

Security disability insurance benefits ("SSDI") under Title II of

the Social Security Act. Plaintiff claims that she is entitled to

receive SSDI benefits due to severe medically determinable

impairments, specifically low back pain radiating to her legs,

neck, shoulders, and arms, resulting from an injury on May 27,

1990, which she alleges prevents her from performing any work.

Now before the Court are the parties' cross motions for judgment

on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure and 42 U.S.C. § 405(g). For the reasons set forth

below, judgment on the pleadings is granted in plaintiff's favor,

and this case is remanded to the Commissioner solely for the

calculation of benefits.

**BACKGROUND**

The following facts are drawn from the administrative record of proceedings relating to this case and the parties' submissions in connection with these motions.

### *Non-Medical Evidence*

Plaintiff, a citizen of the United States, was born on August 28, 1958, in the Dominican Republic. Administrative Record ("R.") at 84, 282, 365. She attended school there through age 18 and the completion of twelfth grade. R. 105, 282, 371. Plaintiff came the United States in 1984, and became a citizen between 1991 and 1992. R. 282, 285, 365. She studied English in the United States and passed the English language test as required for naturalization, but required the assistance of an interpreter for the administrative hearings relating to her SSDI claims. R. 280, 293, 333, 349, 359, 365, 371.

Beginning in 1985, plaintiff worked as a housekeeper cleaning residents' rooms at the YMCA. R. 333-34, 372. She maintained similar employment at the Sheraton Center as a hotel maid from February 1987 to May 1990. R. 105, 118-121, 174, 284. There, plaintiff's job entailed cleaning bedrooms and bathrooms by sweeping, mopping, vacuuming, washing windows, changing sheets, bedding, and other laundry, and refilling toiletries and other supplies. R. 119, 285, 343-44, 372. In the course of her work, plaintiff also lifted mattresses and rearranged hotel

bedroom furniture such as tables and bureaus. R. 121, 285, 342-45. Plaintiff's occupation is categorized by the Dictionary of Occupational Titles ("DOT" or "DICOT") as an unskilled job with a Specific Vocational Preparation level of 2 and a Strength Rating of light work.[1] DICOT 323.687-014. Her additional work requirements involving lifting mattresses and moving furniture likely constituted a functional physical exertion rating of medium.[2] R. 342.

---

[1] DOT, describing the occupation of cleaner or housekeeper, defines a Specific Vocational Preparation level of 2 as "anything beyond short demonstration up to and including 1 month," and defines the Strength Rating, which reflects the estimated overall strength requirement of the job, of light work as

> Exerting up to 20 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or up to 10 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.

DICOT 323.687-014.

[2] Andrew Pasternak, a vocational expert, testified that while the DOT classified plaintiff's housekeeping position as requiring only light exertional work, plaintiff likely performed work requiring a medium level of physical exertion. R. 342-3. DOT defines the Strength Rating of medium work as

> Exerting 20 to 50 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or 10 to 25 pounds of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) and/or greater than negligible up to 10 pounds of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Light Work.

DICOT 324.477-010.

On May 27, 1990, plaintiff, while conducting her work, caught her foot in bedding and fell, hitting her knee and striking her lower back on the metal bed frame. R. 285-86, 372, 376. She sought and received medical treatment. R. 286-87, 373-74. Plaintiff was 31 years old at the time of her injury, and 39 when she first filed for benefits on July 23, 1998. R. 84-87. Plaintiff ceased employment as a housekeeper following her injury, but attempted to return to work at the Sheraton as an elevator operator; she held that position for about two months in June and July 1992. R. 332, 284. Plaintiff met the insured status requirements of the Social Security Act through December 31, 1996. R. 98.

Plaintiff testified that, subsequent to her injury, she experienced constant medium to severe pain in her neck, back, left leg and ankle, and right hand, loss of flexibility in both legs, numbness in her left leg, left ankle stiffness and swelling, and headache; and that, consequently, she could not bend her body, raise her arms, or walk. R. 163-65, 303, 376-78, 388. She reported that her pain persisted despite therapy, that she had great difficulty walking and could not walk more than two or three blocks, that she had been unable to maintain a pain-free position while standing or sitting for longer than twenty to twenty-five minutes, and that she could not sleep through the night due to pain. R. 291-93, 376-78, 380, 390.

During the relevant period, plaintiff lived with her husband, their two children, and a niece. Her niece was approximately eight years old in 1991, her son was born on November 16, 1986 and her daughter on December 26, 1989. R. 364-65, 385. Plaintiff testified that her husband, who worked evenings and nights as a restaurant waiter, attended to the cooking, cleaning, and shopping, and was able, with the help of plaintiff and her niece, to care for the children. R. 104, 290-91, 381-82, 384-85. Plaintiff further stated that her infant daughter regularly slept though the night. R. 390-91. Plaintiff was able, for short durations, to sit and watch TV, listen to the radio, and read books or newspapers; to walk half a block to accompany her children to their school bus; and occasionally and for short durations to visit restaurants or attend church. R. 292-93, 382-83. As her father had fallen ill, plaintiff and her family traveled to the Dominican Republic in 1997; she was able to endure the three-hour flight by repeatedly standing and reseating. R. 295, 383, 386.

### ***Medical Evidence***

### ***Plaintiff's Physicians***

The evidence in the record relating to plaintiff's direct medical treatment consists of medical records from plaintiff's treating physicians, rehabilitation specialist William T. Kuiper, M.D., whose records cover the period from June 1, 1990 through

April 27, 1999, and physical medicine and rehabilitation specialist Augustin Sanchez, M.D., whose records cover the period from April 25, 2001 through November 29, 2004. R. 136-43, 155-59, 162-70, 176-81, 243-69. Dr. Sanchez's records include an evaluation of Magnetic Resonance Imaging performed on plaintiff by radiologist Sidney David Bogart, M.D., dated November 7, 2001. R. 249, 264.

**Dr. Kuiper**

Dr. Kuiper's office notes and reports dated prior to December 31, 1996, the date plaintiff was last insured, show that after an initial emergency admission to St. Clare's Hospital on May 27, 1990, relating to her work injury, plaintiff first saw Dr. Kuiper on June 1, 1990 for follow-up rehabilitative evaluation and treatment. R. 155, 162, 373. At that initial evaluation, Dr. Kuiper reported that plaintiff complained of persistent pain and stiffness in her neck, both arms, and in her back radiating into the right flank and leg, aggravated in any prolonged sitting and standing and preventing bending and lifting, and pain, weakness and instability in the left knee and ankle. R. 155, 162-63.

Physical examination by Dr. Kuiper revealed that plaintiff, measuring 5'5" and weighing 158 pounds, was in significant

distress and presented with a guarded[3] neck and lower back and an antalgic gait[4] favoring the left. *Id*. Subsequent orthopedic examination showed that plaintiff's cervical paravertebral[5] muscles were tender and tight on palpation,[6] with a restricted range of motion.[7] R. 155, 163. Plaintiff's left shoulder was tender, with range of motion restricted in abduction[8] and rotation.[9] *Id*. Her dorsal and lumbosacral[10] paravertebral muscles were tender and tight. R. 156, 163. Her lumbar and sacral vertebrae, from L3 to S1,[11] were very tender on pressure. *Id*. Lumbar range of motion was painfully restricted, and straight-leg

---

[3] A spasm of muscles to minimize motion or agitation of sites affected by injury or disease. *See Stedman's Medical Dictionary* 775 (27th Edition, 2000) ("*Stedman's*").

[4] A characteristic gait adopted so as to avoid pain on weight-bearing structures, in which the stance phase of the gait is shortened on the affected side. *See Stedman's* at 722.

[5] Alongside a vertebra of the vertebral column. *See Stedman's* at 1315.

[6] Examination with the hands; touching, feeling, or perceiving by the sense of touch. *See Stedman's* at 1300.

[7] The range through which a joint can be moved, usually its range of flexion and extension. *See* MdeTerms Medical Dictionary, http://www.medterms.com/script/main/art.asp?articlekey=5208 (last visited July 13, 2007).

[8] Movement of a body part away from the median plane. *See Stedman's* at 2.

[9] Turning or movement of a body around its axis. *See Stedman's* at 1581.

[10] Relating to the vertebrae of the lumbar, the part of the back and sides between the ribs and the pelvis, and the sacrum, the segment of the vertebral column forming part of the pelvis. *See Stedman's* at 1034, 1588.

[11] The spinal column is comprised of 33 vertebrae: (from skull to hip) 7 cervical, 12 thoracic or dorsal, 5 lumbar, and 5 sacral. The lumber vertebrae, usually five in number (L1-L5) are the segments of the spinal column located in lumbar region of the back. The sacral vertebrae, five in number (S1-S5), are those segments which fuse to form the sacrum. *See Stedman's* at 1956-57.

raise testing[12] was positive at 40 degrees on the right and 60 degrees on the left. *Id*. There was laxity of the cruciate and collateral ligaments in plaintiff's left knee,[13] and the right patellar reflex was under active.[14] *Id*. Plaintiff's left ankle was swollen, with pain when the collateral ligaments were stressed. *Id*. Both Dr. Kuiper's notes and report refer to X-rays of the cervical, dorsal, lumbar, and sacral spine showing a fracture of the L3 pedicle and superior articular process[15] of

---

[12] Straight-leg raising, also known as a Lasêgue test, is a means of diagnosing nerve root compression or impingement, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a "positive test"), the pain may indicate herniation. Herniation is when a disc, the soft tissue between vertebrae, protrudes from its normal position, thereby pressing on the nerves and causing pain. *See Stedman's* at 814; *see also* MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=90845 (last visited July 13, 2009).

[13] The two cruciate, or cross shaped, ligaments of the knee attach to the tibia to the femur and prevent displacement of those bones relative to one another. The collateral ligament helps to stabilize the knee joint's hingelike motion. *See Stedman's* at 429, 998.

[14] Tapping the patellar tendon, at the knee, causes a sudden contraction of the thigh muscles with the effect of extending the knee joint, demonstrating the patellar reflex or knee-jerk. *See Stedman's* at 1540. The absence or decrease of patellar reflex, known as Erb-Westphal's sign, can indicate neurological disorder. *See* The Free Dictionary, http://medical-dictionary.thefreedictionary.com/Erb-Westphal+sign (last visited July 13, 2009).

[15] A typical vertebra consists of two essential parts: an anterior (front) segment, which is the vertebral body; and a posterior part – the vertebral (neural) arch – which encloses the vertebral foramen, or opening. The vertebral arch is formed by a pair of pedicles - two short, thick projections extending from the body to the laminae, and a pair of laminae - the flattened posterior portion of the vertebral arch extending between the pedicles and forming the dorsal wall of the vertebral opening; and supports seven processes - projections or outgrowths of tissue from a larger body: four articular, two transverse, and one spinous. The superior articular process projects upward from a lower vertebra to lock with the inferior articular process in the vertebra above it, stabilizing the spine. The joints of the spine, where vertebrae are joined, are commonly called facet joints. *See Stedman's* at 638, 946, 1336, 1447, 1450, 1956-57.

the right and derangement[16] at the L5-S1 facet joint on the

right.[17] R. 156, 163.

Dr. Kuiper diagnosed plaintiff with derangement of the

lumbosacral and cervical spine, especially the L5-S1 facet joint;

fracture of the pedicule and the superior articular process of L3

on the right; clinically bilateral radiculopathy;[18] sprain[19] of

the dorsal spine; contusion[20] and sprain of the left shoulder;

sprain and derangement of the left knee; and sprain of the left

ankle. *Id*. He prescribed a Knight spinal brace,[21] a cervical

collar,[22] and non-steroidal anti-inflammatory medication,[23] and

placed plaintiff on a program of physiotherapy followed by

monthly observation. *Id*.

---

[16] A disturbance of the regular order or arrangement. *See Stedman's* at 478.

[17] Dr. Kupier's notes read, "Xrays of C+D+L-S: fx ped + sap L3 R. facet L5-S1, der R." R. 163. The Court notes that Dr. Kuiper's notes are generally difficult to decipher.

[18] Disorder of the spinal nerve roots, resulting in pain, weakness, numbness, or difficulty controlling specific muscles. *See Stedman's* at 1503.

[19] Injury to a ligament as a result of abnormal or excessive force applied to a joint, but without dislocation or fracture. *See Stedman's* at 1681.

[20] Injury, usually caused by a blow, resulting in hemorrhage, or bleeding, beneath unbroken skin. *See Stedman's* at 406.

[21] External steel appliance that supports the spine. *See Stedman's* at 231, 1278.

[22] External orthopaedic appliance designed to limit cervical spine motion. *See Stedman's* at 1278.

[23] Non-steroidal anti-inflammatory drugs, or NSAIDs, are drugs with analgesic (pain relieving), antipyretic (fever reducing), and anti-inflammatory (inflamation reducing) effects. Common examples include aspirin, acetaminophen, and ibuprofen. *See Stedman's* at 542.

After her initial intake evaluation and diagnosis, plaintiff was treated by Dr. Kuiper 34 times through December 10, 1990, and 22 times, or roughly once per month, between then and July 31, 1992. R. 163-68. Dr. Kupier's office notes during that period reflect plaintiff's ongoing back, neck, and leg ailments. *Id.* While plaintiff noted some initial improvement in her condition, she subsequently reported recurrent severe back pain radiating into both legs, stiffness in her neck, and recurrent pain and stiffness in her left ankle which increased on walking or standing. R. 156, 159, 163-68. Examinations revealed that plaintiff's paravertebral muscles were tender and tight, and that she had a painfully restricted range of motion. *Id.* Her left ankle was swollen, with pain on stress. R. 159. Straight-leg raising was consistently positive bilaterally, plaintiff had difficulty lifting due to diminished right grip strength, and her left knee was unstable. R. 165-67, 169. In May and June 1991, Dr. Kuiper described plaintiff as having mild, partial disability secondary to her accident. R. 166. A Doctor's Initial Report submitted by Dr. Kuiper to the State of New York Worker's Compensation Board, dated November 12, 1991, described plaintiff as totally disabled. R. 159.

From July 1992 to February 1994, plaintiff was not treated by Dr. Kuiper. R. 168. Plaintiff was next treated by Dr. Kuiper in February 1994. *Id.* The medical records between February 22,

1994 and January 1996 document plaintiff's recurrent pain in her back radiating to both legs and in her neck radiating to both arms, and show that plaintiff's knee gave way when bearing weight. R. 143, 168-69. Dr. Kuiper explained plaintiff's February 14, 1994 examination findings as early spondylarthritis[24] resulting in increased radiculopathy and weakness. R. 168. In April 1994, Dr. Kuiper recorded a positive McMurray test,[25] indicating a medical tear, and in July 1994 he specified early spondylarthritis with increased radiculopathy and disk[26] disease. *Id.*

The remainder of Dr. Kuiper's medical records are dated in July, August, and September 1998, and January 1999, after plaintiff's last date insured. R. 169-70. Throughout this period, plaintiff's complaints and Dr. Kuiper's diagnoses appear continuous and increasing in severity. R. 156, 158, 169-170.

In a letter dated April 7, 1998, Dr. Kuiper summarized plaintiff's injuries to her neck and back, and noted that she was unable to return to gainful employment. R. 158. On August 18, 1998, plaintiff reported pain in her back and hips radiating into

---

[24] Inflamation of the intervertebral articulations. *See Stedman's* at 1678.

[25] Rotation of the tibia on the femur to determine injury to meniscal structures of the knee. McMurray's sign is a painful clicking in the knee when it is so manipulated. *See Stedman's* at 1091, 1805.

[26] Intervertebral disks, each composed of an outer fibrous part (disk annulus) that surrounds a central gelatinous mass (nucleus pulposus), are interposed between the bodies of adjacent vertebrae. *See Stedman's* at 523.

her legs and in her neck radiating to her right shoulder, arm, hand, and face, giving way and swelling of her left knee, numbness in her right foot, and angina[27] on exertion. R. 143, 169. Examination revealed a positive Spurling test[28] bilaterally, hypoactive reflexes, sensory loss in the right C5 and C6, left L4, and right L5 and S1 dermatomes,[29] positive straight-leg raising at 40 degrees on the right and 60 degrees on the left, and ligament laxity in the left knee. *Id.* Plaintiff had shortness of breath on minimal exertion, and her blood pressure[30] decreased from 130/85 to 95/85 while walking to the examining table. *Id.* She was unable to sit straight, and appeared very depressed. *Id.* Dr. Kuiper diagnosed plaintiff with cervical and lumbar spine spondylarthritis with bilateral radiculopathy with L3 pedicle fracture status post her fall in May 1990, heart disease, and post traumatic stress disorder with reactive depression. *Id.* Dr.

---

[27] A severe, often constricting pain in the chest. *See Stedman's* at 80.

[28] Evaluation for cervical nerve root impingement, which is considered positive when the maneuver involved elicits pain radiating along the arm. *See Stedman's* at 1809.

[29] An area of skin mainly supplied by a single spinal nerve. *See Stedman's* at 481.

[30] Blood pressure ("BP") is the pressure (force per unit area) exerted by blood circulating within the systemic arteries on the walls of blood vessels, and constitutes one of the principal vital signs. BP is reported in millimeters of mercury ("mmHg") and expressed in terms of systolic and diastolic pressure. Systolic pressure occurs near the end of the cardiac cycle, and diastolic pressure near the beginning of the cardiac cycle. An example of normal measured values for a resting, healthy adult human is 120 mmHg systolic and 80 mmHg diastolic (written as 120/80). *See Stedman's* at 495, 1442, 1780; The Free Dictionary, http://medical-dictionary.thefreedictionary.com/blood+pressure (last visited July 14, 2009).

Kuiper reconfirmed his evaluation, clinical findings, and diagnoses in a letter, dated August 18, 1998, to the State Office of Temporary and Disability Insurance covering his treatment of plaintiff from her injury in May 1990. R. 136-143.

In a report dated April 27, 1999, Dr. Kuiper reiterated that plaintiff's general condition was deteriorating and that she continued to suffer from exacerbations and remissions of the symptoms from cervical and lumbrosacral spine spondylarthritis with radiculopathy and sciatica[31]. R. 155-56. Root compression tests were positive on the right and deep tendon reflexes were hypoactive on the right. *Id*. Plaintiff experienced increasing discomfort and instability in her knees, sensory deficit in her arm and leg, and required back support. *Id*. Her left knee was swollen and warm with crepitation[32] on motion. *Id*. Plaintiff's walking was limited. *Id*. In a Residual Functional Capacity ("RFC")[33] form dated July 23, 1999, Dr. Kuiper specified that plaintiff could not lift or carry at all, could stand or walk for

---

[31] Pain in the lower back and hip radiating down the back of the thigh into the leg, usually due to herniated lumbar disk comprising a nerve root, most commonly the L5 or S1 root. *See Stedman's* at 1602.

[32] A crackling sound or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions, or sensation felt on placing the hand over the seat of a fracture. *See Stedman's* at 423-24.

[33] Residual Functional Capacity ("RFC") is the most that a person can do despite his or her limitations, defined by the SSA as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

only less than one hour per day, and that her ability to sit was limited to less than two hours per day, noting further that she could not sit straight. R. 157. Plaintiff was last seen by Dr. Kuiper on January 7, 1999. R. 156, 170.

**Dr. Sanchez**

Dr. Augustin Sanchez, a physical medicine and rehabilitation specialist, first examined plaintiff on April 25, 2001, over four years after the date she was last insured. R. 176, 243, 256. Dr. Sanchez's narrative report of his initial examination and evaluation, dated July 25, 2001, recounted plaintiff's injury and consequent pain and debilitation, as well as her report of Dr. Kuiper's evaluation, diagnosis, and treatment. R. 176. Physical examination revealed acute tenderness at L4-L5 and L5-S1, positive straight-leg raising bilaterally, and forward torso flexing limited to 25-30 degrees with paralumbar spasm extending to the mid-thoracic area. R. 177. Plaintiff ambulated with an unsteady gait. *Id*. Motor strength was diminished and rated 3 out of 5 at the right quadriceps and on dorsiflexion and plantarflexion.[34] *Id*. Reflexes were diminished at the left Achilles tendon and right quadriceeps indicating bilateral

---

[34] Testing the strength of muscle groups is rated on a scale of 0/5 to 5/5, with 3/5 indicating that movement was possible against gravity, but not against resistance by the examiner. *See* Hal Blumenfeld, *Neuroanatomy Through Clinical Cases*, *available at* http://www.neuroexam.com/content.php?p=29 (last visited July 15, 2009). Dorsiflexion is the upward movement of the foot or toes, so that the toes are brought closer to the shin, while plantarflexion is movement in the opposite direction, as when depressing an automobile pedal. *See Stedman's* at 537, 1392.

involvement of the lumbar spine in the aforementioned symptoms. *Id*. X-rays were unavailable for review. *Id*. Dr. Sanchez diagnosed lumbar derangement, ruling out lumbar herniation and radiculopathy, and determined that plaintiff was totally disabled and unfit for gainful employment. *Id*. In a subsequent physical capacity evaluation dated August 6, 2001, Dr. Sanchez confirmed that plaintiff's ability to lift and carry was limited to 10 pounds, her ability to stand, walk, or sit to less than 2 hours per day. R. 181. He prescribed the NSAID naproxen at 550 mg twice daily, issued a lumbar corset, and placed plaintiff on a physiotherapy treatment program. R. 176. Dr. Sanchez concluded that plaintiff's condition was causally related to her work injury of May 27, 1990. *Id*.

Dr. Sanchez's records contain a report of range of motion testing conducted on plaintiff dated May 18, 2001, indicating below-normal right lateral flexation and positive straight-leg raise. R. 179-80, 252-53. Electromyography ("EMG") conducted and documented by Dr. Sanchez on September 26, 2001 yielded results compatible with L4-L5 radiculopathy. R. 250-51. Magnetic Resonance Imaging ("MRI") of plaintiff performed on November 7, 2001 by radiologist Dr. Sidney David Bogart on referral by Dr. Sanchez demonstrated a posterior herination of the L4-L5

intervertebral disk with anterior thecal sac deformity[35] and some impingement on the exiting left nerve root, dehydration of the L4-L5 intervertebral disk,[36] and Schmorl's node invaginations[37] at L2, L4 and L5. R. 249, 264.

Physician's reports completed by Dr. Sanchez for plaintiff's disability claim due to physical impairment, dated November 29, 2004 and January 6, 2006, detail plaintiff's monthly follow-up visits and physiotherapy. R. 243-48, 256-61. The two reports mirror each other. *Id*. Plaintiff's ongoing symptoms included severe back pain radiating to the lower extremities and bilateral leg weakness and numbness. R. 243-44, 256-57. The reports recount the aforementioned laboratory reports and diagnostic studies, including the EMG and MRI. R. 244, 257. Dr. Sanchez reported that, during an entire 8-hour workday, plaintiff could sit for a total of 1-2 hours, stand or walk for a total of half and hour to an hour, only occasionally lift or carry up to 10 pounds, only occasionally bend or reach, could not squat, crawl, or climb at all, and could not use her feet for repetitive movements. R. 245-46, 258-59. He diagnosed lumbar radiculopathy, lumbar fracture,

---

[35] The thecal sac is a membrane that surrounds the spinal cord and circulates cerebral spinal fluid. *See* Douglas M. Gillard, M.D., *Disc Anatomy*, *available at* http://www.chirogeek.com/000_Disc_Anatomy.htm (last visited July 15, 2009).

[36] Dehydration of an intervertebral disk's gelatinous center limits its ability to absorb shock. *See Stedman's* at 468, 1240.

[37] An abnormal upward and downward protrusion of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae. *See Stedman's* at 1223.

lumber herniation, and cervical derangement, and prescribed
Bextra, Flexeril, Vioxx, Celebrex, Naproxen, Fiorinal, Lidoderm
and Voltaren[38] in addition to monthly physiotherapy. R. 244-45,
257-58.

***SSA Assessments***

The record also contains are the initial denial and denial
after reconsideration of plaintiff's SSDI claims by the Social
Security Administration ("SSA"), both of which contain
physicians' signatures. R. 52-53. Plaintiff's initial claim was
denied in November 1998, and denied after reconsideration in
February 1999. R. 52-53, 56-60, 62-64. Neither C. Ladopoulous,
M.D. nor M. Malik, M.D., who respectively signed the initial

---

[38] Bextra is a trademarked preparation of valdecoxib, a NSAID administered orally especially to treat osteoarthritis. *See* Merriam-Webster's Medical Dictionary, *available at* http://www.merriam-webster.com/medical/valdecoxib (last visited July 20, 2009). Flexeril is a brand name for the drug cyclobenzaprine, a skeletal muscle relaxant administered together with rest and physical therapy to relieve muscle spasms and pain. *See* Merriam-Webster's Medical Dictionary, *available at* http://www.merriam-webster.com/medical/cyclobenzaprine (last visited July 20, 2009). Vioxx is a trademarked preparation of rofecoxib, used to relieve the signs and symptoms of osteoarthritis and rheumatoid arthritis and to manage acute pain in adults. *See* Merriam-Webster's Medical Dictionary, *available at* http://www.merriam-webster.com/medical/rofecoxib (last visited July 20, 2009). Celebex is a brand name for a preparation of celecoxib, a NSAID administered orally especially to relieve the pain and inflammation of osteoarthritis and rheumatoid arthritis. *See* Merriam-Webster's Medical Dictionary, *available at* http://www.merriam-webster.com/medical/celecoxib (last visited July 20, 2009). Fiorinal is a pain reliever, as well as an anti-inflammatory and a fever reducer, combining aspirin, butalbital, one of a class of barbiturates that slow down your central nervous system and cause relaxation, and caffeine. *See* Drugs.com, http://www.drugs.com/fiorinal.html (last visited July 20, 2009). Lidoderm, the brand name for the generic drug lidocaine topical, is a local anesthetic. *See* Drugs.com, http://www.drugs.com/lidoderm.html (last visited July 20, 2009). Voltaren is a trademarked preparation of the sodium salt form of diclofenac, a NSAID used especially to treat the symptoms of rheumatoid arthritis, osteoarthritis, and spondylitis. *See* Merriam-Webster's Medical Dictionary, *available at* http://www.merriam-webster.com/medical/diclofenac (last visited July 20, 2009).

denial and the denial after reconsideration, conducted any physical examination or treatment of plaintiff. R. 150, 152. An undated, nearly illegibly handwritten note by Dr. Ladopoulous explained that Dr. Kuiper declined to provide office notes, basic range of motion findings, or offer any objective reports, and that plaintiff's claim was denied due to insufficient medical evidence establishing the severity of her impairment. R. 152. An uncompleted RFC assessment prepared by Dr. Malik on February 1, 1999 noted that no new evidence was offered documenting the period prior to plaintiff's December 31, 1996 date last insured. R. 144-50.

**Medical Expert Testimony**

Despite the fact that plaintiff never filed a claim related to any mental disorder, *see* R. 338, Gene Gitelle, M.D., a board certified psychiatrist, testified as a medical expert ("ME") at a hearing held before an Administrate Law Judge ("ALJ") of the SSA Office of Hearings and Appeals on October 23, 2001. R. 337-41. This was the second of three hearings before an ALJ regarding plaintiff's claim for SSDI.[39] *See* R. 25. Dr. Gitelle stated that there was no evidence in plaintiff's medical records showing the presence of the criteria for post-traumatic stress disorder, a diagnosis reported by Dr. Kuiper, and that plaintiff did not have

---

[39] No medical or vocational experts retained by SSA testified at the first administrative hearing on September 9, 1999. *See* R. 357-93.

any mental impairment that affected her ability to function. R.
338-40.

Donald Goldman, M.D., an orthopedist, testified as an ME at
the third hearing, held on January 17, 2006. R. 29, 296-313.
Having reviewed plaintiff's medical records from the relevant
period, Dr. Goldman testified that he had insufficient evidence
on which to base a definite opinion regarding the severity of
plaintiff's injury. R. 297-300. Dr. Goldman commented that Dr.
Kuiper's records, while referring to an X-ray report, did not
contain test results from objective diagnostic testing such as an
MRI or EMG. R. 298-99. He noted further that the range of motion
testing, such as leg raises, and the tendon reflex testing
conducted by Dr. Kuiper produced objective findings. R. 299-300,
306-7. Regarding Dr. Kuiper's diagnoses, Dr. Goldman explained
that without X-ray films or a radiologist's report, he could not
verify that plaintiff sustained an L3 pedicle fracture. R. 299-
300. He further questioned Dr. Kuiper's treatment plan, noting
that a patient with that type of acute fracture would have
undergone follow-up testing, including no less than a computed
tomogrophy scan ("CAT" or "CT" scan),[40] would have been fitted
for a custom-made brace, and would have been referred to an
orthopaedic specialist. R. 302, 311-12. Dr. Goldman confirmed

----

[40] A sectional view of the body generated by a large series of
two-dimensional X-ray images taken around a single axis of rotation. *See*
Merriam-Webster Medical Dictionary *available at*
http://www.merriam-webster.com/medical/cat+scan (last visited July 23, 2009).

that Dr. Kuiper's diagnosis of L3 pedicle fracture and radiculopathy was consistent with the range of motion testing and with plaintiff's reported pain and debilitation. R. 302-5.

### *Procedural History*

Plaintiff applied for SSDI benefits on August 3, 1998, alleging disability commencing on July 10, 1992 as a result of her work injury on May 27, 1990. R. 26, 84-87. Her claim was denied at the initial level in November 1998, and again after reconsideration in February 1999. R. 52-53, 56-60, 62-64.

Plaintiff requested a hearing before an Administrative Law Judge (ALJ) of the SSA Office of Hearings and Appeals on February 19, 1999, which was held before ALJ Marilyn Hoppenfeld on September 9, 1999. R. 65, 357-93. Plaintiff provided full testimony at the hearing. *Id.* By decision dated January 21, 2000, ALJ Hoppenfeld found that plaintiff was not disabled prior to her date last insured, December 31, 1996. R. 182-99.

On February 9, 2000, plaintiff requested appellate review of the ALJ's decision by the Appeals Council of the Social Security Administration. R. 208-210. By order dated February 14, 2001, the Appeals Council vacated ALJ Hoppenfeld's January 21, 2000 decision and remanded plaintiff's claim for further administrative proceedings. R. 205-06. The Appeals Council determined that ALJ Hoppenfeld failed to properly develop the evidentiary record from plaintiff's treating physician, Dr.

Kuiper, noting that the ALJ made no attempt to recontact Dr. Kuiper for additional information or for clarification of the reasons for his opinion and diagnosis in accordance with 20 C.F.R § 404.1512, and consequently instructed the ALJ on remand to give further consideration to plaintiff's treating physician, explain the weight accorded to that source, and, as appropriate, develop the evidentiary record by contacting the treating physician. *Id*.

A second hearing was conducted by ALJ Hoppenfeld on October 23, 2001. R. 315-56. In order to expedite the proceedings, the ALJ and plaintiff's counsel read their notes from the previous proceeding into the record; in addition, plaintiff, a medical expert, and a vocational testified. *Id*. Dr. Gitelle testified as a ME that plaintiff did not have any mental impairment that affected her ability to function. R. 338-40. Andrew Pasternak, a vocational expert, testified that while the DOT classified plaintiff's housekeeping position as requiring only light exertional work, plaintiff likely performed work requiring a medium level of physical exertion. R. 342-3. He further stipulated that, accepting Dr. Kuiper's assessment of plaintiff's debilitation, specifically regarding her inability to stand or sit for prolonged periods of time, plaintiff would be unemployable in the national economy. R. 346-49, 351-53. On January 24, 2002, ALJ Hoppenfeld issued a decision again finding that plaintiff was not disabled prior to her last date insured.

R. 214-28.

Plaintiff subsequently appealed the ALJ's decision on
February 6, 2002. R. 230-34. In an order dated October 22, 2004,
the Appeals Council again vacated ALJ Hoppenfeld's decision and
remanded for further administrative proceedings. R. 237-39. The
Appeals Council explained that ALJ Hoppenfeld, in determining
that plaintiff had a residual functional capacity to perform
light exertional work, had rejected the opinion of plaintiff's
treating physician, Dr. Kuiper, without establishing a medical
basis on which to make that determination. R. 237. The Appeals
Council directed that a new ALJ give further consideration to the
treating source opinion, explain the weight accorded to that
evidence, further develop the record evidence as to the treating
physician's opinion and records, and obtain evidence from a
medical expert, preferably an orthopedist, to clarify the nature,
severity, and duration of plaintiff's impairments. R. 237-39.

On January 17, 2006, ALJ Manuel Cofresi conducted a third
hearing. R. 278-314. Plaintiff provided full testimony, supplying
substantively the same information as in the first hearing, with
some additional details regarding her daily schedule. *See* R. 291-
93. Dr. Goldman, an orthopedist, testified as a ME. R. 296-309.
By decision dated February 21, 2006, ALJ Cofresi found that
plaintiff was not disabled prior to her last date insured,
concluding that despite severe impairments, she was capable of

performing the full range of medium exertional work required for conducting her prior occupation. R. 25-33. Plaintiff requested review of that decision on February 27, 2006. R. 20-21.

The Appeals Council granted the request for review, but in its decision dated August 22, 2008, concurred with and adopted ALJ Cofresi's February 21, 2006 decision. R. 10-14. In its decision, the Appeals Council afforded little weight to Dr. Kuiper's determinations, finding that they were inconsistent with his own treatment notes and insufficiently supported by clinical signs or diagnostic studies. *Id*. It also adopted the ALJ's assessment that, because Dr. Sanchez's treatment relationship with plaintiff began nearly five years after the expiration of her insured status, his opinion was not probative and was therefore entitled to little weight. R. 11, 31. The Appeals Council also concluded that plaintiff's assertions concerning her symptoms and functional limitations were not fully credible. R. 13. Therefore, the Appeals Council concluded that plaintiff retained a residual functional capacity which did not preclude her from performing her past relevant work. R. 12. ALJ Cofresi's determination, as adopted by the Appeals Council, became the Commissioner's final decision. R. 7-9.

## DISCUSSION

### I. Standard of Review

"The scope of review of a disability determination under 42

U.S.C. § 423(a)(1) involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *see also Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003). The court must first decide whether the Commissioner applied the correct legal principles in making his determination. *Green-Younger*, 335 F.3d at 105; *see also Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). If the Commissioner applied the correct legal standard, the court must then determine whether the Commissioner's decision is supported by "substantial evidence" as required by 42 U.S.C. § 405(g). *Johnson*, 817 F.2d at 985; *see also Green-Younger*, 335 F.3d at 105 (the inquiry must determine "whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard.").

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). An evaluation of the "substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld, *see* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41,

46 (2d Cir. 1996), even if substantial evidence supporting the claimant's position also exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").

However, "although factual findings by the Commissioner are 'binding' when 'supported by substantial evidence,' '[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.'" *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)).

## II. Disability Determination Under the Social Security Act

The Social Security Act states that a person shall be considered to be disabled for the purposes of receiving SSDI benefits when he or she is "unable to engage in any substantial gainful activity[41] by reason of any medically determinable physical or mental impairment which can be expected to result in

---

[41] Substantial gainful activity is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 404.1572.

death or which has lasted or can be expected to last for a
continuous period of not less than twelve months." 42 U.S.C. §
1382c(a)(3)(A). Further, a person will be determined to have a
disability "only if his physical or mental impairment or
impairments are of such severity that he is not only unable to do
his previous work but cannot, considering his age, education, and
work experience, engage in any other kind of substantial gainful
work which exists in the national economy..." 42 U.S.C. §
1382c(a)(3)(B). To be eligible for SSDI benefits, an applicant
must be insured for disability benefits, and must therefore
establish her disability prior to her last date insured. 42
U.S.C. §§ 432(a)(1)(A), 423(c); *see also Arnone v. Bowen*, 882
F.2d 34, 37-38 (2d Cir. 1989).

Regulations promulgated by the Commissioner set forth a
five-step process to determine whether an impairment or
impairments demonstrate a disability. The Second Circuit has
described the five-step process as follows:

> First, the [Commissioner] considers whether
> the claimant is currently engaged in
> substantial gainful activity. If he is not,
> the [Commissioner] next considers whether the
> claimant has a "severe impairment" which
> significantly limits his physical or mental
> ability to do basic work activities. If the
> claimant suffers such an impairment, the
> third inquiry is whether, based solely on
> medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of
> the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider
> him disabled without considering vocational

> factors such as age, education, and work
> experience.... Assuming the claimant does not
> have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe
> impairment, he has the residual functional
> capacity to perform his past work. Finally,
> if the claimant is unable to perform his past
> work, the [Commissioner] then determines
> whether there is other work which the
> claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); 20 C.F.R. § 416.920(a)(4)(i-v). While the claimant has the burden of demonstrating that she meets all requirements for benefits, 42 U.S.C. § 423(d)(5)(A), at step five of the analysis, the burden shifts to the Commissioner to show that the claimant can perform other substantial, gainful work available in the national economy. *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

Further, it is the duty of the ALJ to investigate and develop the facts and arguments both for and against the granting of benefits. *See Butts v. Barnhart*, 388 F.3d 377, 381 (2d Cir. 2004). Thus, "the ALJ, unlike a judge in a trial, must affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even if the claimant is represented by counsel." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). Accordingly, "where there are deficiencies in

the record, an ALJ is under an affirmative obligation to develop a claimant's medical history," *Rosa*, 168 F.3d at 79, and ensure that a claimant's complete medical history is accounted for, "especially the observations and opinions of a claimant's treating physician." *Kilkenny v. Astrue*, No. 05-CV-6507, 2009 WL 1321692, at *15 (S.D.N.Y. May 12, 2009).

## III. Analysis

### A. The Commissioner's Determinations

Using the five-step sequential process, the Appeals Council[42] found at step one that, for the period from the alleged onset of plaintiff's injuries through her date last insured, plaintiff was not engaged in substantial gainful activity. R. 11, 27. At step two, which requires a determination of whether the claimant has a "severe medically determinable physical or mental impairment...which significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. § 404.1520(a)(4)(ii), (c), the Appeals Council found that plaintiff had severe impairments. At step three, however, the Appeals Council found that plaintiff's severe impairments did not meet or equal in severity any of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P ("the Listing of Impairments"). R.

---

[42] For the sake of clarity, since the Appeals Council's determination is the Commissioner's final decision, I refer to the Appeals Council even where the evaluations and determinations discussed are those of the ALJ, as incorporated by reference and adopted in the Appeals Council's decision.

11, 30. At step four, the Appeals Council assessed plaintiff's
residual functional capacity, finding that plaintiff was not
precluded from performing her past work as a hotel maid, which
required light work. R. 11-12, 30. The Appeals Council noted that
this finding reflected the little weight afforded Dr. Kuiper's
opinions, which, in light of plaintiff's medical records and
testimony, and the testimony of medical expert Dr. Goldman, it
found to be inconsistent with Dr. Kuiper's own treatment notes
and insufficiently supported by clinical signs or diagnostic
studies. R. 12. In adopting the ALJ's findings, the Appeals
Council similarly gave little weight to Dr. Sanchez's medical
opinion, noting that his treatment relationship with plaintiff
began nearly five years after the expiration of her insured
status. R. 11, 31. Last, despite the finding of no disability at
step four, the Appeals Council completed the sequential analysis,
concluding at step five that there were a significant number of
jobs in the national economy that plaintiff was capable of
performing. R. 11, 13, 31-32.

### B. Appeals Council's Application of Treating Physician Rule

Plaintiff claims that the Appeals Council improperly
afforded little weight to the opinions of her treating
physicians. Specifically, she claims that it failed to provide
"good reasons" for the weight afforded and neglected its duty to

affirmatively develop the administrative record with regard to the medical evidence informing upon which those opinions were based. There is no dispute that Dr. Kuiper and Dr. Sanchez qualify as plaintiff's treating physicians.

## 1. Treating Physician Rule

In evaluating medical source opinions, the "treating physician rule" established by SSA regulations[43] mandates that "the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw*, 221 F.3d at 134; 20 C.F.R. § 416.927(d)(2). The coincidence of a treating source's evaluation and treatment with the claim for SSDI benefits is not determinative; accordingly, "a treating physician's retrospective medical assessment of a patient may be probative." *Perez*, 77 F.3d at 48. Thus, if a treating physician's opinion is either not well supported by medically acceptable clinical and laboratory diagnostic techniques or inconsistent with other substantial evidence in the record, it need not be afforded controlling weight.

---

[43] 20 C.F.R. § 416.927(d)(2) provides: "Generally, we give more weight to opinions from your treating sources ... [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 416.927(d)(2). "Treating source" is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides ... or has provided ... medical treatment or evaluation and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 404.1502.

Where a treating physician's opinion is not accorded
controlling weight, the ALJ "must consider various 'factors' to
determine how much weight to give the opinion." *Halloran v.
Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Such factors include
"(i) the frequency of examination and the length, nature, and
extent of the treatment relationship; (ii) the evidence in
support of the opinion; (iii) the opinion's consistency with the
record as a whole; (iv) whether the opinion is from a
specialist;" and (v) other factors which tend to support or
contradict the opinion. *Shaw*, 221 F.3d at 134; 20 C.F.R. §
404.1527(d)(2)-(6). Given the ALJ's duty to develop the record
*sua sponte*, *see Tejada*, 167 F.3d at 774, the Appeals Council may
not reject the treating physician's conclusions based solely on a
lack of clear medical evidence or inconsistency without first
attempting to fill the gaps in the administrative record. *See
Rosa*, 168 F.3d at 79. Furthermore, when according the treating
physician's opinion less than controlling weight, the ALJ must
comprehensively set forth "good reasons" for the weight ascribed.
*See Halloran*, 362 F.3d at 33; 20 C.F.R. § 404.1527(d)(2). Remand
is appropriate where the ALJ fails to provide "'good reasons' for
not crediting the opinion of a claimant's treating physician."
*Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

## 2. Dr. Kuiper

The Appeals Council declined to afford controlling weight to

Dr. Kuiper's opinion based on its determination that Dr. Kuiper's opinion was not well-supported by medical evidence and inconsistent with other substantial evidence. R. 12-13, 31.

**i. Medical Evidence Supporting Dr. Kuiper's Opinion**

The Appeals Council concluded that Dr. Kuiper's opinion was not supported by objective evidence since his treatment records were sporadic, contained only minimal objective findings, and were devoid of diagnostic tests establishing plaintiff's impairments. R. 11-12, 29-31.

The rejection of a treating physician's opinion because his "limited findings and the intermittent nature of his treatment" could not support a finding of disability "falls far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion." *Shaw*, 221 F.3d at 134. Here, the Appeals Council noted the break in treatment from July 1992 to February 1994 and the evidence of only two treatment sessions from July 1995 through January 1996. R. 11-12, 29-32. However, despite the almost two-year gap in Dr. Kuiper's treatment record noted by the Appeals Council, Dr. Kuiper's relationship with plaintiff spans nearly a decade and includes scores of treatment visits and evaluations both during and after the period during which plaintiff was insured. The Appeals Council's conclusory assessment of Dr. Kuiper's treatment relationship with plaintiff as sporadic in determining that his

opinion was unsupported by medical evidence amounts to an improper application of the treating physician rule. *See Rosa*, 168 F.3d at 78-79.

While the ALJ and the Appeals Council are "free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, [they are] not free to set [their] own expertise against that of a physician who testified before [them]." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998). Here, the Appeals Council characterized the range of motion and straight-leg raise tests as only "minimal objective medical evidence" of plaintiff's disability. R. 11-12, 29-31. The only medical opinions offered in the record regarding the straight-leg raise and other range of motion tests - by Drs. Kuiper and Goldman - considered them objective medical evidence. *See* R. 307-08. Since Dr. Goldman confirmed that the straight-leg raise tests performed by Dr. Kuiper constitute objective medical findings, the Appeals Council's conclusory characterization of those tests as minimal evidence unable to support Dr. Kuiper's medical opinion approaches an improper substitution of its own views for actual medical expertise.

Further, the Appeals Council neglected its duty to supplement the record. "For the [Appeals Council] to conclude that plaintiff presented no evidence of disability at the relevant time period, yet to simultaneously discount the medical

opinion of h[er] treating physician, violates [its] duty to
develop the factual record, regardless of whether the claimant is
represented by legal counsel." *Shaw*, 221 F.3d at 134 (citing
*Schaal*, 134 F.3d at 505). In concluding that Dr. Kuiper's medical
opinion was unsupported by clinical signs or laboratory findings,
in part because the record does not include a report of the X-
rays Dr. Kuiper cites in his medical notes as establishing
plaintiff's injuries, the Appeals Council failed to explain why
the report was missing or cite evidence showing that efforts had
been made to obtain the reports.[44] Without attempting to fill
this gap in the record, the Appeals Council could not determine
that Dr. Kuiper's medical opinion is not well supported by
medical evidence.

## ii.  Inconsistencies Between Dr. Kuiper's Opinion and Medical Evidence

The Appeals Council further found that Dr. Kuiper's opinion
was inconsistent with his own treatment notes, specifically

---

[44] It bears noting that, even had the Appeals Council otherwise properly
adhered to the treating physician rule, its failure to execute its affirmative
duty to develop the record renders its decision reversable based on legal
error and as unsupported by substantial evidence. *See Tejada*, 167 F.3d at 775-
76. As the procedural history here makes clear, the ALJ three times failed,
and was twice subsequently directed by the Appeals Council, to develop the
evidentiary record - each time with specific reference to the X-rays cited by
Dr. Kuiper. *See* R. 29, 205-06, 237-39. The SSA's own medical expert explained
that he could not offer an opinion regarding plaintiff's injuries because the
record did not contain those very X-ray results. R. 297, 299, 300, 312. In its
final determination, the Appeals Council appears to have either overlooked
this glaring gap in the record and the specific directives of its two previous
remands or given up completely on properly discharging its duty. In any case,
more than a decade after plaintiff first filed for SSDI claims, her treating
physician appears yet to have been contacted, and the record yet to have been
developed as required.

citing Dr. Goldman's conclusion that Dr. Kuiper improperly
performed the straight-leg raise testing on plaintiff, and Dr.
Goldman's characterization of Dr. Kuiper's treatment plan as
inconsistent with his diagnosis of pedicle fracture because it
did not include either MRI or CT scans or a custom-made brace.[45]
R. 12, 30-31. There are several problems with this inconsistency
finding. First, while the Appeals Court cites Dr. Goldman as
testifying that Dr. Kuiper failed to perform straight-leg raises
properly, that testimony does not appear in the record. *See* R.
296-309, 310-314. Second, that Dr. Goldman questioned Dr.
Kuiper's treatment program does not necessarily imply that Dr.
Kuiper's treatment program was inconsistent with his own
diagnosis. Since "the opinion of the treating physician [is not]
to be discounted merely because he has recommended a conservative
treatment regimen," the discrepancy between Dr. Goldman's ideal
treatment program and Dr. Kuiper's treatment plan does not
necessarily render the latter inconsistent with the record.
*Burgess*, 537 F.3d at 129. Further, while Dr. Goldman testified

---

[45] While Dr. Goldman initially questioned Dr. Kuiper's treatment program
because it did not appear to include a prescription for a custom-made back
brace, he later acknowledged that plaintiff testified that Dr. Kuiper
prescribed, and that plaintiff wore, a back brace. *See* R. 302-03. Dr. Kuiper's
medical records include his prescription of a Knight spinal brace in June
1990, when plaintiff first began treatment. R. 156, 163. Plaintiff testified
at her 1999 hearing before ALJ Hoppenfeld that, after Dr. Kuiper prescribed
the back brace, she was measured and fitted for the brace in early 1991. R.
374-75. ALJ Cofresi mistakenly stated that plaintiff testified before ALJ
Hoppenfeld that she did not fill her prescription for the back brace. R. 310.
He then reiterated that significant factual error in evaluating Dr. Kuiper's
medical opinion and in determining plaintiff's credibility. R. 31.

that he could not reconcile Dr. Kuiper's diagnosis of a pedicle
fracture with his treatment program, he repeatedly acknowledged
that he could not offer an opinion regarding the severity of
plaintiff's injuries because the record did not contain the X-ray
results cited by Dr. Kuiper. R. 297, 299, 300, 312. Dr. Goldman
also testified that plaintiff was indeed prescribed and wore a
back brace pursuant to Dr. Kuiper's treatment program, and that
Dr. Kuiper's diagnoses of pedicle fracture and radiculopathy and
his drug prescriptions were consistent with his assessment of
plaintiff's subjective experience of pain and the medically
objective straight-leg raise and other range of motion tests. R.
302-03, 304-08. Thus the Appeals Council did not consider the
totality of Dr. Goldman's testimony in finding Dr. Kuiper's
opinion "inconsistent with other substantial record evidence."
*Shaw*, 221 F.3d at 134.

Further, that the Appeals Council failed to supplement the
record by contacting Dr. Kuiper to obtain the X-ray records
belies the notion that Dr. Goldman's testimony, self-admittedly
incomplete without those records, renders Dr. Kuiper's opinion
inconsistent with the record. *See Clark v. Comm'r of Soc. Sec.*,
143 F.3d 115, 118 (2d Cir. 1998) (ALJ determination vacated and
remanded where ALJ failed "to seek out clarifying information
concerning perceived inconsistencies between [the treating
physician's] two reports."). The Appeals Council's

characterization of Dr. Kuiper's opinion as inconsistent with the evidence thus resulted from an improper imposition of its own assessment in place of medical evidence. *See Shaw*, 221 F.3d at 134-35.

### iii. Appeals Council's "Good Reasons"

The Appeals Council's failure to apply the correct legal standard in considering Dr. Kuiper's medical opinion and determining not to afford it controlling weight is grounds for reversal. *Pollard*, 377 F.3d at 188-89. Thus, whether the Appeals Council's analysis contains "good reasons" for assigning Dr. Kuiper's opinion little weight need not be determined. *See Halloran*, 362 F.3d at 32-33. It is nevertheless worth mentioning that, while "[g]enuine conflicts in the medical evidence are for the Commissioner to resolve," *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002), the Appeals Council's decision to credit the opinion of Dr. Goldman, a non-treating medical expert, over that of plaintiff's treating physician, is in tension with the regulatory regime, which requires the Commissioner to afford more weight to the opinion of an examining physician than to physicians who have not examined the claimant. *See* 20 C.F.R. § 404.1527(d)(1); *see also Hidalgo v. Bowen*, 822 F.2d 294, 297 (2d Cir. 1987) ("A corollary to the treating physician rule is that the opinion of a non-examining doctor by itself cannot constitute the contrary substantial evidence required to override the

treating physician's diagnosis."); *see also Vargas v. Sullivan*, 898 F.2d 293, 295-96 (2d Cir. 1990) ("The general rule is that... reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability. The advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant.").

### 3. Dr. Sanchez

In adopting the ALJ's determination, the Appeals Council concluded that, because Dr. Sanchez's treatment relationship with plaintiff began nearly five years after the expiration of her insured status, his opinion was not probative, and therefore assigned it little weight. R. 11, 31. Dr. Sanchez's opinion was, nevertheless, substantially consistent with Dr. Kuiper's evaluations and diagnoses and supported by significant diagnostic tests. *See* R. 176-181. Dr. Sanchez concluded that plaintiff's condition was causally related to her work injury of May 27, 1990. R. 176.

It is well settled law in the Second Circuit that "a treating physician's retrospective medical assessment... may be probative," *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996), and thus "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly

compelling non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003). Accordingly, simply noting that Dr. Sanchez began treating plaintiff well after the onset of her injury and the expiration of her insured status does not amount to contradictory medical findings or "overwhelmingly compelling non-medical evidence" sufficient to reject the opinion of a treating physician. *See Rivera v. Sullivan*, 923 F.2d 964 (2d Cir. 1991) (reviewing Second Circuit law on retrospective diagnosis and reversing denial of benefits where retrospective diagnosis of treating physician was not given sufficient weight with regard to degenerative condition). This cursory rejection "suggests that the ALJ failed to engage in meaningful consideration of the treating physician rule" regarding Dr. Sanchez's opnion. *Scandura v. Astrue*, 07-CV-5098, 2009 WL 648611, at *8 (E.D.N.Y. Mar. 10, 2009); *see also Rosa*, 168 F.3d at 78-79. The Appeals Council's failure to apply the correct legal standard in assessing Dr. Sanchez's medical opinion is grounds for reversal. *Pollard*, 377 F.3d at 188-89.

## B. Appeals Council's Assessment of Plaintiff's Credibility

Plaintiff also contends that the Appeals Council's determination that her "subjective complaints [were] not fully credible" was improperly conclusory. R. 13. While "[i]t is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of

witnesses, including the claimant," *Aponte v. Secr'y, Dep't of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984), and "factual findings by the Commissioner are binding when supported by substantial evidence," *Pollard*, 377 F.3d at 188-89 (citations omitted), a "finding that the witness is not credible must [] be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988). The ALJ must assess the credibility of a claimant's subjective complaints by considering the record in light of symptom-related factors set forth by statute.[46] *See* 20 C.F.R. § 404.1529(c)(3).

Here, the ALJ[47] found plaintiff's allegations to be "disproportionate to the record," stating that they were not

---

[46] These factors include:
    (i) [Claimant's] daily activities;
    (ii) The location, duration, frequency, and intensity of [claimant's] pain or other symptoms;
    (iii) Precipitating and aggravating factors;
    (iv) The type, dosage, effectiveness, and side effects of any medication [claimant] take or have taken to alleviate [claimant's] pain or other symptoms;
    (v) Treatment, other than medication, [claimant] receive[s] or ha[s] received for relief of [claimant's] pain or other symptoms;
    (vi) Any measures [claimant] use[s] or ha[s] used to relieve [claimant's] pain or other symptoms (e.g., lying flat on [] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
    (vii) Other factors concerning [claimant's] functional limitations and restrictions due to pain or other symptoms.
20 C.F.R. § 404.1529(c)(3).

[47] The Appeals Council concluded that plaintiff's "subjective complaints [were] not fully credible for the reasons identified in the body of [its] decision." R. 13. It nevertheless neglected to specify those reasons in its decision. *See* R. 10-14. For the purposes of this opinion, I assume it adopted the reasoning articulated by the ALJ. *See* R. 31-32.

supported by the medical record; plaintiff did not require
hospitalization or surgical intervention; her medical treatment
was conservative; she chose not to use a back brace; the
medication prescribed to her was not unusual; and she engaged in
a "reasonable range of daily living activities." R. 31-32. This
assessment tracks the factors listed in 20 C.F.R. §
404.1529(c)(3). However, for the reasons set forth below, much of
it is unsupported by substantial evidence.

First, the ALJ's assessment of plaintiff's credibility
relies on his improper evaluation of the opinions of plaintiff's
treating physicians. For example, the ALJ takes particular note
of the fact that only "minimal physical findings" in the medical
record support plaintiff's reported symptoms. R. 30-31. Yet,
since the Appeals Council's characterization of the diagnostic
tests performed by Dr. Kuiper as "minimal evidence" improperly
substitutes its own views for actual medical expertise, and in
light of the substantial gaps in the record that the two ALJs and
the Appeals Council neglected to fill, this characterization
cannot alone serve to discredit plaintiff's subjective
allegations. Further, since "the opinion of the treating
physician [is not] to be discounted merely because he has
recommended a conservative treatment regimen," *Burgess*, 537 F.3d
at 129, neither should a conservative treatment program alone
weigh substantially against plaintiff's credibility. In addition,

since no evidence exists in the record indicating that hospitalization or surgery were recommended treatment options for plaintiff's alleged condition, that plaintiff did not receive such intervention cannot be dispositive as to her credibility.

Second, the ALJ's credibility assessment also rests on factual error. While he stated that plaintiff chose not to use a back brace, the record shows the opposite. Plaintiff testified that Dr. Kuiper prescribed, and that plaintiff wore, a back brace. *See* R. 302-03. Dr. Kuiper's medical records include his prescription of a Knight spinal brace in June 1990, when plaintiff first began treatment. R. 156, 163. Plaintiff testified at her 1999 hearing before ALJ Hoppenfeld that, after Dr. Kuiper prescribed the back brace, she was measured and fitted for the brace in early 1991. R. 374-75. ALJ Cofresi thus relied on an incorrect statement of plaintiff's testimony and her medical records in determining that plaintiff was not fully credibile.[48]

Third, I note that the fact that plaintiff engaged in "a reasonable range of daily living activities" does not amount to substantial evidence negating the credibility of plainitff's subjective complaints. As an initial matter, the ALJ mischaracterized plaintiff's testimony. For example, where he stated that she "maintain[s] her household, and looks after family members... she shops, cooks, and cleans," he neglected to

---

[48] See also note 45, *supra*.

note that plaintiff repeatedly testified as to her limited ability to engage in such activities. *See* R. 381, 384-85. The Second Circuit "ha[s] stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act." *Balsamo*, 142 F.3d at 81 (citations omitted) ("when a disabled person gamely chooses to endure pain in order to pursue important goals, such as attending church and... shopping for their family, it would be a shame to hold this endurance against h[er] in determining benefits unless h[er] conduct truly showed that [s]he is capable of working."). Without specifying how plaintiff's daily schedule renders the symptoms she alleges non-credible, the ALJ's credibility assessment does not rest on substantial evidence.

Regardless, the ALJ did not meet his obligation to state his reasoning with sufficient specificity. *See Williams*, 859 F.2d at 260-61. The ALJ offered no discussion as to what factors in his credibility assessment he found to be significant, or how he balanced the various factors. *See* R. 31-32. Instead, he made the following conclusory statement after listing the factors: "Given these factors, the claimant is not entirely credible." R. 32. The ALJ's failure to substantiate or articulate his credibility finding "fatally undermines [his] argument that there is substantial evidence adequate to support his conclusion that claimant is not under a disability." *Williams*, 859 F.2d at 261.

## C. Appeals Council's Determination of Plaintiff's RFC

Finally, plaintiff claims that the Appeals Council's conclusion that she retains the RFC to perform the full range of medium work required by her previous occupation is unsupported by substantial evidence.

Under step four of the inquiry to determine whether plaintiff's impairments demonstrate a disability, which involves a determination as to "whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform h[er] past work," *Rosa*, 168 F.3d at 77, the Appeals Council is required to base its decision regarding plaintiff's RFC on all relevant evidence in the record. See 20 C.F.R. § 404.1545(l)(a). The Appeals Council must, as always, support its determination with "substantial evidence." *Green-Younger*, 335 F.3d at 105. Although the treating physician rule does not extend to a treating source's opinion regarding a claimant's RFC, *see* 20 C.F.R. § 404.1527(e) ("[T]he final responsibility for deciding ... issues [such as RFC] is reserved to the Commissioner. We will not give any special significance to the source of an opinion on [such] issues..."), because RFC is a medical determination,[49] I

---

[49] SSA regulations describe two distinct kinds of assessments of what an individual can do despite the presence of a severe impairment. The first, a medical determination termed a "medical source statement" and set forth in 20 C.F.R. §§ 404.1513(b), (c), 416.913(b), (c) as a "statement about what you can still do despite your impairment(s)," is made by an individual's medical source and based on that source's own medical findings. "Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on

bear in mind that the nether the ALJ nor Appeals Council may substitute its own view of the medical evidence for that of a medical expert. *See Balsamo*, 142 F.3d at 81; *see also Shaw*, 221 F.3d at 134.

Neither the ALJ nor the Appeals Council referred to medical evidence supporting its RFC determination that plaintiff could sit, stand, and walk for up to six hours per eight-hour day and occasionally lift and carry as much as 50 pounds. R. 12, 30. The ALJ seems to have arrived at this determination simply by rejecting Dr. Kuiper's medical opinion. R. 30. Significantly, the only RFC assessments contained in the record were completed by plaintiff's treating physicians. Rejecting expert medical opinion, without setting forth adequate reasons based on medical evidence, cannot constitute the "substantial evidence" required to support the Appeals Council's conclusions. *See Green-Younger*,

issues concerning the nature and severity of an individual's impairment(s)." S.S.R. 96-5P, 1996 WL 374183, at *4-5 (interpreting 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii)). On the other hand, the second type of assessment, RFC, which "describes an adjudicator's finding about the ability of an individual to perform work-related activities," is "based upon consideration of all relevant evidence in the case record, including medical evidence and relevant non-medical evidence." S.S.R. 96-5P; *see also* 20 C.F.R. §§ 404.1545, 404.1546, 416.945, 416.946 (RFC is an adjudicator's ultimate finding of "what you can still do despite your limitations."). RFC assessments utilize the "Strength Rating" terminology employed in the DOT "regarding the extent to which an individual is able to perform exertional ranges of work," i.e., "sedentary," "light," "medium." S.S.R. 96-5P. The term "RFC" is often used to describe both types of assessments, despite their distinction.

Accordingly, ALJ Cofresi's conclusion that plaintiff could "sit, stand and walk for up to 6 hours in an 8 hour day, and lift and carry as much as 50 pounds occasionally," R. 30, is properly a medical determination and not a RFC assessment. It was nevertheless described, by the ALJ, Appeals Council, and the parties, as a RFC assessment. His determination that plaintiff retained the RFC for the full range of medium work, R. 32, is properly a RFC assessment, if one based on a misapplication of the legal standard and unsupported by substantial evidence.

335 F.3d at 105.

Further, "[t]he record's virtual absence of medical evidence pertinent to the issue of plaintiff's RFC reflects the ALJ's failure to develop the record, despite his obligation to develop a complete medical history." *Sobolewski v. Apfel*, 985 F.Supp. 300, 314 (E.D.N.Y. 1997). Even if the Appeals Council could properly discount the opinions of plaintiff's treating physicians, it still had an affirmative obligation to develop the record in order to produce a RFC determination grounded in substantial evidence. *See Tejada*, 167 F.3d at 774; *Rosa*, 168 F.3d at 79. The Appeals Council's failure to substantiate its determination and develop the record renders its determination that plaintiff is not disabled unsupported by substantial evidence. *See Balsamo*, 142 F.3d at 82.

## IV. Remedy

Where there is "no apparent basis to conclude that a more complete record might support the Commissioner's decision, we have opted simply to remand for a calculation of benefits." *Rosa*, 168 F.3d at 83; *see also Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980) (reversing and ordering that benefits be paid where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose."). By contrast, "remand for further development of the evidence" may be appropriate "where there are gaps in the administrative record or

the ALJ has applied an improper legal standard." *Rosa*, 168 F.3d at 82-83 (citations omitted).

In this case, the ALJ and Appeals Council applied an erroneous legal standard to the assessment and weighing of plaintiff's treating physicians' opinions, failed to develop the record as to plaintiff's medical records, and reached determinations unsupported by substantial evidence. Now, after the ALJs' and Appeals Council's repeated misapplication of the treating physician's rule and failure to supplement the record, and ten years since plaintiff originally filed for SSDI benefits, there is no showing that further development of the record and additional proceedings would result in the evidence required to substantiate a conclusion that plaintiff is not disabled. While, "absent a finding that the claimant was actually disabled, delay alone is an insufficient basis on which to remand for benefits," *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996), such a remedy is appropriate where the Commissioner's decision was not based on substantial evidence and further development of the record would not change that result, and there is substantial evidence in the record that plaintiff is disabled. *See Rivera v. Barnhart*, 379 F.Supp.2d 599, 604 (S.D.N.Y. 2005); *see also Balsamo*, 142 F.3d at 82. "[W]hen, as here, the reversal is based... on the [Commissioner's] failure to sustain his burden of adducing evidence of the claimant's capability of gainful employment and

the [Commissioner's] finding that the claimant can engage in [work as defined by the Regulations] is not supported by substantial evidence, no purpose would be served by our remanding the case for rehearing unless the [Commissioner] could offer additional evidence... and show good cause 'for failure to incorporate such additional evidence into the record in the prior proceeding.' *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983) (citing 42 U.S.C. § 405(g)) (denial of benefits reversed and remanded where Secretary failed to sustain burden of proving claimant's RFC). Accordingly, the case is remanded for the calculation of benefits.

**CONCLUSION**

For the reasons set forth above, this case is remanded to the Commissioner solely for the calculation of benefits. The Clerk is directed to transmit a copy of the within to all parties and the Commissioner.


SO ORDERED.

Dated:     Brooklyn, New York
           August 5, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge